IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| ARMANDO AGUILAR MORALES, on behalf of himself and his minor daughter J.J.A.R., and PEDRO RAMOS PEREZ on behalf of himself and his minor son F.R.I., | | |
| *Plaintiffs*, | | Civil Action No. 3:23-cv-00247 |
| v. | | |
| UNITED STATES OF AMERICA, | | |
| *Defendant*. | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

### INTRODUCTION

1.      This case is brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and seeks damages for the actions by the United States of America cruelly and deliberately inflicting emotional distress and for other tortious conduct by forcibly separating migrants Armando Aguilar Morales and his then-nine-year-old daughter J.J.A.R. (the "Aguilar Family"), and Pedro Ramos Perez and his then-twelve-year-old son F.R.I. (the "Ramos Family"). Both the Aguilar and Ramos Families travelled to the United States from Guatemala. However, unbeknownst to them, members of the United States Government (the "Government") had commenced a practice of inflicting distress and suffering so severe that Plaintiffs and future Central American migrants would abandon any hope of seeking asylum or other lawful entry to the United States. The Government did this by forcibly separating parents and children, putting parents and children in separate squalid conditions where they were ill-treated, and deliberately causing trauma to both parents and children by separating them and denying them contact with each other for many months.

2.      On April 21, 2018, the Aguilar Family arrived in El Paso, Texas. Four days later, Government officials used force to remove sobbing nine-year-old J.J.A.R. from the arms of her father, Mr. Aguilar Morales. Government officials put J.J.A.R. on a plane and sent her two-thousand miles away from her nearest family member, Mr. Aguilar Morales. For a week, no one in the Aguilar family knew where their daughter was. Ultimately, the Government kept J.J.A.R. separated from her family for more than five months, detained her in a group home where she experienced sexual assault and further trauma, and only permitted her brief phone calls with her family, who were all more than three thousand miles away in Guatemala following her father's deportation on May 21, 2018. The Government did not reunite J.J.A.R. with her family until September 27, 2018, when she was deported to Guatemala following her detention in Government custody for more than five months.

3.      On May 8, 2018, the Ramos Family arrived in El Paso, Texas. One day later, the Government separated twelve-year old F.R.I. from his father, Pedro Ramos Perez. F.R.I., who spoke the Mayan language of Ixil, spoke little or no Spanish (and no English), had no understanding of why he was separated from his father and did not know where he was taken and housed when the Government put him on a plane and sent him away from his father. Ultimately, F.R.I. was separated from his family for more than four months and permitted only brief phone calls with his family, who were all thousands of miles away in Guatemala following his father's deportation on July 7, 2018. The Government did not reunite F.R.I. with his family until September 16, 2018, when he was deported to Guatemala following his detention in Government custody for more than four months.

4.      Justice requires redress for the suffering inflicted by the unlawful, cruel, and tortious conduct of Defendant.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346(b), and 1350.

6.       Plaintiffs have exhausted their claims under the Federal Tort Claims Act ("FTCA"). Plaintiffs timely filed all required administrative forms with each of the relevant agencies of the United States of America more than six months ago. There has been no final disposition of their administrative claims, and Plaintiffs now exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

7.       Venue is proper under 28 U.S.C. §§ 1402(b) and 1391(e)(1):  a substantial part of the events, acts, or omissions giving rise to the claims occurred in this District, and no real property is involved in this action.

## PARTIES

8.       Plaintiff Armando Aguilar Morales ("Mr. Aguilar Morales") was separated from his daughter, Plaintiff J.J.A.R., on or about April 25, 2018. Mr. Aguilar Morales is from Guatemala and now resides in Nashville, Tennessee.

9.       Plaintiff J.J.A.R., now 14 years old, was 9 years old at the time of the events described in this Complaint. She was separated from her father on or about April 25, 2018. J.J.A.R. is from Guatemala and now resides in Nashville, Tennessee.

10.      Plaintiff Pedro Ramos Perez ("Mr. Ramos Perez") was separated from his son, Plaintiff F.R.I., on or about May 9, 2018. Mr. Ramos Perez is from Guatemala and now resides in Atlanta, Georgia.

11.      Plaintiff F.R.I, now 17 years old, was 12 at the time of the events described in this Complaint. He was separated from his father on May 9, 2018. F.R.I. is from Guatemala and now resides in Matthews, North Carolina.

3

12.     Defendant United States of America (the "Government") is sued under the Federal Tort Claims Act for the tortious acts of its employees, including employees of the Department of Justice (DOJ) and its Office of the Attorney General ("OAG"), the Department of Homeland Security (DHS) and its agencies, Customs and Border Protection ("CBP"), Immigration and Customs Enforcement (ICE), and United States Immigration and Citizenship Services ("USCIS"), and the Department of Health and Human Services ("HHS") and its Office of Refugee Resettlement (HHS-ORR).

<u>**STATEMENT OF FACTS**</u>

**I.    Defendant Forcibly Separated J.J.A.R. from her father, Mr. Aguilar Morales.**

    **A.  *J.J.A.R. and Mr. Aguilar Morales Fled Guatemala and were Forcibly Separated in the United States***

13.     On April 14, 2018, Mr. Aguilar Morales fled violence and desperation in Guatemala with his nine-year old daughter, J.J.A.R He mortgaged his home and spent his life's savings to fund this journey.

14.     Mr. Aguilar Morales and J.J.A.R. arrived in the United States on or about April 21, 2018, after crossing the border near El Paso, Texas. CBP agents detained them shortly thereafter in a freezing-cold facility (often referred to in Spanish as an "*hielera*" or icebox) with inadequate clothes, inadequate blankets, and inadequate food, where they shared a cell with approximately six other parents and their children.

15.     According to CBP records, on April 23, 2018, a CBP officer questioned Mr. Aguilar Morales about his immigration history, and he answered honestly that he had previously been deported from the United States.

16.     On April 23, 2018, DHS found Mr. Aguilar Morales inadmissible based on his past immigration history and ordered him removed.

17.     Following his April 2018 entry, the Government did not charge or prosecute Mr. Aguilar Morales for illegal entry or any other offense.

18.     On or around April 25, 2018, the Government separated J.J.A.R. from her father by force. Government agents called Mr. Aguilar Morales and J.J.A.R. into the hallway just outside their cell. The agents announced that they planned to transfer Mr. Aguilar Morales to another detention facility and they planned to bring J.J.A.R. to a group home. As soon as J.J.A.R. understood that the immigration authorities planned to separate her from her father, she grabbed hold of Mr. Aguilar Morales and began sobbing. Mr. Aguilar Morales, in turn, grabbed hold of his daughter. Immigration agents grabbed J.J.A.R. and attempted to forcefully pry her apart from her father. Mr. Aguilar Morales objected to their use of force, telling them to let go and that their use of force was only making matters worse. But the Government agents succeeded, and forcibly separated J.J.A.R. from Mr. Aguilar Morales.

19.     Immediately after this forced separation, authorities told Mr. Aguilar Morales that he would not see his daughter again. They said that it was the law that children had to be separated from their parents. Mr. Aguilar Morales was distraught.

20.     Following this forced separation, Mr. Aguilar Morales and his family had no idea where the agents had taken J.J.A.R.

21.     Immigration officials permitted Mr. Aguilar Morales to call his wife, J.J.A.R.'s mother, who was still in Guatemala. Mr. Aguilar Morales informed her that the Government had forcibly removed J.J.A.R. and taken her to an unknown location. J.J.A.R.'s mother was angry and distraught, which further exacerbated the distress experienced by Mr. Aguilar Morales.

22.     Mr. Aguilar Morales did not sleep for three days and nights because of his trauma and distress at not knowing where his daughter was. Following these three days, a government agent reported that she had located J.J.A.R. and would arrange a phone call between them.

### B. DHS Officials Kept Mr. Aguilar Morales in Inadequate Conditions and Failed to Reunite him with J.J.A.R.

23.     CBP detained Mr. Aguilar Morales from April 21 through May 21, 2018, in its immigration detention facilities in El Paso and in other locations.

24.     CBP detained Mr. Aguilar Morales in an *hielera*, and agents awoke him daily at 4:00 a.m. CBP provided him with inadequate clothing, inadequate blankets, and inadequate food. CBP failed to provide Mr. Aguilar Morales with adequate quantities of food at regularly-scheduled times.

25.     While in CBP custody, Mr. Aguilar Morales developed a painful condition on his feet, including warts, callouses, and pus, that he believed was caused by walking back and forth to the shower barefoot, and by Government-provided shoes and socks that were unclean and ill-fitting. Mr. Aguilar Morales requested medical attention, but the Government failed to provide adequate medical attention for nearly two weeks. Mr. Aguilar Morales continues to suffer from foot pain as a result.

26.     When Mr. Aguilar Morales learned that the Government planned to deport him, he objected that he did not want to leave J.J.A.R. alone in the United States, but Government agents rejected this concern.

27.     The Government deported Mr. Aguilar Morales to Guatemala on May 21, 2018. At no time before his deportation did the Government make any effort to reunite him with J.J.A.R.

28.     After Mr. Aguilar Morales was deported, he made the painful decision not to speak to J.J.A.R. when she called home because he did not want her to learn that he was back in

Guatemala and she was now completely alone in the United States, a foreign county more than 3,000 miles away from any family member.

### C. DHS Officials Transferred J.J.A.R. Thousands of Miles from her Father, to a Residential Facility in New York City, where she was Sexually Abused

29.     Although immigration officials apprehended J.J.A.R with her father, on or around April 21, 2018, DHS processed J.J.A.R. separately from her father. At that time, Defendants falsely classified J.J.A.R. as an "unaccompanied juvenile" and placed her into HHS-ORR custody.

30.     Unbeknownst to her parents, the Government put J.J.A.R. on a plane and flew her more than two-thousand miles away from her father to New York City, where HHS-ORR placed her in the care and custody of HHS-ORR contractor Cayuga Centers ("Cayuga").

31.     HHS-ORR's placement authorization provided that J.J.A.R. was "in the legal custody of the Federal government" and was placed with Cayuga for "care and shelter." Cayuga agreed to adhere to HHS-ORR's requirements, and HHS-ORR retained the authority and discretion to remove J.J.A.R. from Cayuga's care at any time.

32.     After many days of fear and uncertainty, the Government permitted J.J.A.R. to place calls to her father and mother and she informed them that she was in New York City. Upon learning that that his daughter was alone in New York City, two-thousand miles away from him, Mr. Aguilar remained distressed.

33.     For more than five months, from on or about April 25 through September 27, 2018, the Government detained J.J.A.R. away from her family.

34.     During this period of detention, the Government imposed further isolations on J.J.A.R. For example, the Government only permitted J.J.A.R. to speak with her family in Guatemala two times per week for five minutes at a time.  These calls made her miss her family even more and feel depressed and alone in her detention far away in New York City.

35.     The Government detained J.J.A.R. in a foster care group home with other boys and girls.

36.     On at least one occasion, a boy residing in the same group home attempted to inappropriately touch J.J.A.R. J.J.A.R. was alone with this boy when he tried to touch her private parts below her underwear. J.J.A.R. informed her foster mother about this incident, but her foster mother ignored her and took no action to stop the abuse. Following the first incident, on multiple occasions when J.J.A.R. showered, the boy attempted to enter the bathroom or peek at her under the door. This experience was upsetting for J.J.A.R., who felt unsafe and unprotected after these experiences, and as a result, even more scared and lonely being so far away from her family and left to deal all alone with this new trauma.

37.     Government records indicate that staff members of HHS-ORR-contractor Cayuga were aware that J.J.A.R. experienced this further traumatic situation while in Government custody. The Government's records indicate that Cayuga staff completed Significant Incident Reports ("SIRs") on three occasions concerning sexual abuse experienced by J.J.A.R.  HHS-ORR policies require contractors to communicate SIRs to HHS-ORR.

38.     The Government subsequently responded to this situation by transferring J.J.A.R. to yet another foster home.

39.     J.J.A.R. remained in HHS-ORR custody for over three more months after learning about the sexual abuse that she had experienced before returning her to her family in Guatemala.

40.     On or about September 27, 2018, J.J.A.R. was deported to Guatemala following the withdrawal of her application for admission and an immigration judge's grant of voluntary departure.

41.     J.J.A.R. was not given the chance to depart voluntarily when her father was deported or at any time earlier than this.

### D. Both J.J.A.R. and Mr. Aguilar Morales Experienced Emotional Distress and Continue to Suffer as a Result of the Government's Actions

42.     The separation, isolation, and sexual abuse caused J.J.A.R. deep and long-lasting emotional harm. J.J.A.R., then a nine-year-old child, felt alone and sad. She was not prepared to have been separated; she had travelled with her father and, once separated, did not know when she would be reunited with her father or any other member of her family.

43.     Even after returning home to her family in Guatemala, J.J.A.R. continued to suffer as a result of the traumas she experienced while in Government custody. She experienced emotional problems, flashed back to her traumatic experience in the United States, had trouble focusing on schoolwork and was forgetful. She was afraid of the dark, experienced nightmares, and had significant difficulty sleeping alone. Her appetite diminished, and she had difficulty eating a healthy diet. She felt scared, betrayed, and abandoned. She had difficulty trusting people, both family members and others.

44.     Mr. Aguilar Morales experienced intense emotional suffering after the Government separated J.J.A.R. and kept her apart from him in New York while he was thousands of miles away in Government custody and then deported to Guatemala. He felt distraught, betrayed, and guilty. He was not prepared to have been separated; he travelled to the United States intending to care for his daughter. Once separated, Government officials led him to believe that they would be reunited quickly, and during the five-month separation, the uncertainty heightened his distress.

45.     Mr. Aguilar Morales continues to suffer emotional distress as a result of the trauma he experienced while in Government custody. He continues to feel sadness, guilt, and fear. He still cries when he thinks about or talks about what happened to J.J.A.R. Sometimes memories flood

back at inopportune moments, such as when he is working, and he begins to cry. Mr. Aguilar

Morales believes that he will never be able to forget the pain of the traumatic moment when

Government officials ripped his sobbing young daughter out of his arms and the months of pain and

suffering that following during their continued separation.

## II. Defendant Forcibly Separated F.R.I. from his father, Mr. Ramos Perez.

### A. *F.R.I. and Mr. Ramos Perez Fled Guatemala and were Separated in the United States*

46. Mr. Ramos Perez fled Guatemala with his twelve-year old son, F.R.I., on April 28,

2018. Both spoke the Ixil language and spoke little or no Spanish and no English.

47. Mr. Ramos Perez and F.R.I. arrived in the United States on or around May 8, 2018,

after crossing the border near El Paso, Texas. CBP agents detained them shortly thereafter.

48. On or about May 9, 2018, CBP officials separated F.R.I. from his father, Mr. Ramos

Perez. On that date, CBP officials took Mr. Ramos Perez from the detention center and ordered

F.R.I. to remain at the detention center. DHS officials then brought Mr. Ramos Perez to appear

before a judge. When he returned, F.R.I. was gone.

49. On or about May 9, 2018, during the time that Mr. Ramos Perez was at the court

appearance, CBP officials took F.R.I. away to an unknown destination.

### B. *DHS Officials Kept Mr. Ramos Perez in Inadequate Conditions and Failed to Reunite him with F.R.I.*

50. When Mr. Ramos Perez realized the officials had lied and taken his son, he cried and

was very upset. He asked about his son but got no answer. DHS officials hassled him by asking if

F.R.I. was really his son, insinuating that he was lying. He gave F.R.I.'s birth certificate to the

officials to prove it; the officials kept his documents and did not return them.

51. For many days, Mr. Ramos Perez did not know where his son was. He finally was

allowed to call home; he learned from his family that they had spoken with F.R.I. Mr. Ramos Perez

cried and could not stop thinking of his son, concerned that F.R.I. did not speak Spanish and would be afraid.

52.     Finally, on or about July 4, 2018, DHS officials allowed Mr. Ramos Perez to speak by telephone with F.R.I., for about five minutes. At that time, DHS officials still did not inform Mr. Ramos-Perez where his son was being detained. During this call, Mr. Ramos-Perez was initially relieved and happy to hear his son's voice and his son's assurance that he was doing alright, but then Mr. Ramos Perez realized that F.R.I. might simply be telling him that he was alright so as not to make Mr. Ramos-Perez suffer more. They were both very afraid and did not feel they could speak freely, and the conversation was very short. Both father and son were crying during this conversation.

53.     This was the only communication that DHS officials permitted between Mr. Ramos Perez and F.R.I. during Mr. Ramos Perez's two months in Government custody.

54.     Later, DHS officials told Mr. Ramos Perez that if he signed a paper, then he could be with his son. But then the DHS officials said that Mr. Ramos Perez should sign other papers to be deported and told him that his son was being kept in the United States. When he learned that DHS planned to keep his son in their custody after Mr. Ramos Perez returned to Guatemala, Mr. Ramos Perez became afraid that the Government was going to kill his son, recalling the "disappearances" caused by Guatemalan government forces during the Guatemalan civil war in the 1980's.

55.     Mr. Ramos Perez was detained for nearly two months. During this time, DHS provided him with inadequate clothing, inadequate blankets, and inadequate food, which at times was rotten or spoiled. DHS failed to provide Mr. Ramos Perez with adequate quantities of food at regularly scheduled times.

56.     Mr. Ramos Perez was deported to Guatemala on July 7, 2018. At no time between his criminal proceedings and his deportation did the Government make any effort to reunite him with F.R.I.

### C.  DHS Officials Transferred F.R.I. to another Detention Center, away from his Father

57.     On or about May 9, 2018, unbeknownst to his family, the Government transferred twelve-year old F.R.I. to another detention center. He travelled by car and plane and did not know where he was housed. Government officials did not explain to F.R.I. what was happening and failed to provide a translator to his language, Ixil. He was not given a chance to say goodbye to his father.

58.     Although immigration officials apprehended F.R.I. with his father and detained them together, on or around May 9, 2018, DHS processed F.R.I. separately from his father. At that time, Defendants falsely classified F.R.I. as an "unaccompanied juvenile."

59.     The Government detained F.R.I., separated from his family, from May 10 through September 16, 2018, in a fenced-in shelter for juvenile migrants.

60.     F.R.I. was very scared about being alone. For several days, he had no contact at all with any member of his family. Finally, after about a week, the Government permitted him to call his mother in Guatemala. During that call, he told her that the Government had separated him from his father, and she was barely able to speak with him because she cried so much upon hearing this.

61.     During his detention, neither DHS nor any other Government officials provided F.R.I. with an interpreter, translator, or other Government agent who could communicate in his language, Ixil.

62.     The Government permitted F.R.I. to make calls to his family in Guatemala approximately once per week for a few minutes. The Government did not permit F.R.I. any contact

with his father during Mr. Ramos Perez's detention, except for the single five-minute phone call on or about July 4, 2018.

63.     F.R.I. was separated from his family for more than four months, from his separation from his father on May 9, 2018, until DHS deported him to Guatemala on or about September 16, 2018.

### D.  Both F.R.I. and Mr. Ramos Perez Experienced Emotional Distress and Continue to Suffer as a Result of the Government's Actions

64.     The Government's separation of F.R.I. and his father, and continued separation of F.R.I. and Mr. Ramos Perez, caused F.R.I. deep and long-lasting emotional harm.

65.     Even after returning home to his family in Guatemala, F.R.I. continued to suffer emotional distress as a result of the trauma he experienced while in Government custody. He was afraid when asked to go somewhere independently to perform family chores and errands, such as collecting firewood at the family's home. He no longer liked to play with his friends. He did not speak much and had difficulty eating and maintaining a healthy diet.

66.     Mr. Ramos Perez also suffered as a result of the Government's separation of him from his son. While in Government custody, Mr. Ramos Perez started to have frequent headaches, thinking about his son. He was terrified and was afraid that his son could be killed while separated from him. He continues to suffer sadness, fear, and guilt as a result of the trauma he experienced while in Government custody.

## III.  The United States Government's Family Separation Policy and Practice was Deliberately Cruel and Inhumane

### A.  Defendant Intentionally Separated Families to Unlawfully Coerce and Terrorize Migrant Families, a Practice Controversial Even Among Government Authorities

67.     In early 2017, officials in the Trump administration who were responsible for immigration policy discussed and considered a plan to separate families arriving at the border, even

though the parents and children had arrived at the United States border together. Under this plan, administration officials would separate parents and children by prosecuting the parents and treating their children as "unaccompanied minors."

68.     Such a policy would be a significant change from past practice. Under the prior "family unit policy," the Border Patrol did not refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents. Off. of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services*, 21-028 (Jan. 2021), at 14, https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf (hereinafter, the "DOJ OIG Report").

69.     Under the former policy, "[p]revious administrations used family detention facilities, allowing the whole family to stay together while awaiting their deportation case in immigration court, or alternatives to detention, which required families to be tracked but released from custody to await their court date." Bipartisan Policy Center, *Why Are Families Being Separated at the Border? An Explainer*, (June 13, 2018) avail. at https:// bipartisanpolicy.org/blog/why-are-families-being-separated-at-the-border-an-explainer/.

70.     Prior administrations considered prosecuting members of family units but decided against it due to the harm it would cause. Mem. from DHS Sec'y Jeh Charles Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, at 5, 6 (Nov. 20, 2014), available at https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf (directing DHS staff to exercise prosecutorial discretion in decisions regarding prosecution and detention of, *inter alia*, migrants "who demonstrate that they are primary caretakers of children").

71.    A September 30, 2016 DHS Advisory Committee report noted that even very brief "[s]eparation can be acutely frightening for children, and can leave children in ad hoc care situations that compromise their safety and well-being. It can also be traumatizing and extremely stressful for the parent who is dealing with the underlying situation but also possible feelings of guilt and worry for their child." *Report of the DHS Advisory Committee on Family Residential Centers* (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

72.    The Trump Administration designed new policies departing from past practice which targeted Latino, Central American migrant families. First, on February 20, 2017, then-DHS Secretary John F. Kelly issued a memorandum outlining a plan to block and deter migration at the Southern Border which focused on unaccompanied minors who travelled to the United States to reunite with their parents who were already present in the country. U.S. Dep't of Homeland Sec., Implementing the President's Border Security and Immigration Enforcement Improvements Policies (Feb. 20, 2017), available at https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf. In the memo, Secretary Kelly noted that most "unaccompanied alien children" come from El Salvador, Honduras, and Guatemala, and their parents "who reside illegally in the United States" often pay "smuggler[s] . . . several thousand dollars" to bring their children here. *Id.* at 10. The memo ordered ICE and CBP to initiate removal proceedings against such parents, who had typically arrived before their children and had not been apprehended at the border. *Id.* at 11. Alternatively, the memo directed ICE and CBP to refer parents for criminal prosecution for "smuggling" their children into this country. The memo explicitly instructed immigration officers to take these actions "[r]egardless of the desires for family reunification." *Id.*

15

73.     Three weeks later, in early March 2017, Secretary Kelly confirmed that DHS was considering another policy—this time, to separate migrant families who traveled together to the Southern Border of the United States, From the first mention, he made clear that the purpose of the Family Separation Policy under consideration was to attempt to deter migration. Presuming that families would not come to the United States if they faced the intense trauma of forcible separation, he stated, "Yes, I'm considering [separating families] in order to deter more movement along this terribly dangerous network. I am considering exactly that. [Children] will be well cared for as we deal with their parents." Daniella Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border*, CNN, Mar. 7, 2017, https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.

74.     In line with Secretary Kelly's statement, in March 2017 CBP launched a pilot project suspending the "family unit policy" and instead separating families in the El Paso Sector of the Southern Border (hereinafter, the "Pilot Program"). DOJ OIG Report, at 13. Under the Pilot Program, CBP planned to separate parents and children, refer the parents for prosecution for immigration offenses, and transfer them to the custody of the U.S. Marshals Service during prosecution and any associated incarceration. Meanwhile, CBP would designate the children as "Unaccompanied Alien Child[ren]" under 6 U.S.C. § 279(g)(2) (defining term to include children under eighteen who have no parent or legal guardian present in the United States or "available to provide care and physical custody" in the United States). CBP would then transfer the children to the custody of HHS-ORR, which is legally charged with the care of unaccompanied children. 6 U.S.C. § 279; 8 U.S.C. § 1232(b), (c).

75.     On April 11, 2017, then-Attorney General Jefferson B. Sessions issued a memorandum to all federal prosecutors directing them to increase immigration prosecutions. Mem. from Att'y Gen. Jefferson B. Sessions to All Federal Prosecutors, Renewed Commitment to Criminal Immigration Enforcement (Apr. 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

76.     In October 2017, a Border Patrol official spoke with the U.S. Attorney for the District of New Mexico urging prosecution of parents as a deterrent to migration: "Although it is always a difficult decision to separate these families, . . . it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally."  Caitlin Dickerson, *The Secret History of The U.S. Government's Family-Separation Policy*, The Atlantic, p. 47 (Sept. 2022) (hereinafter "*Secret History*").

77.     Under the Pilot Program, the Border Patrol's El Paso Sector began referring adults for criminal prosecution even when they had arrived in the United States as members of family units with accompanying minors, and the U.S. Attorney's Office for the Western District of Texas developed guidelines to prosecute those "family unit adults" even if such prosecution resulted in the separation of children from their parents. DOJ OIG Report, at 14.

78.     At the outset of the Pilot Program, the U.S. Attorney for the Western District of Texas, Richard Durbin, had serious concerns about accepting referrals of family member adults for illegal entry prosecutions because of the potential consequences associated with the separation of families, communicating to a colleague about such prosecutions that "history would not judge that kindly." DOJ OIG Report, at 14.

79.     The Government's prosecutions of family unit adults under the Pilot Program also prompted concerns from federal judges in the Western District of Texas. In a November 2017 prosecution for illegal entry, U.S. Magistrate Judge Miguel A. Torres ordered the Government to provide further information about children who had been separated from the five defendants in the case, and stated, "In a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent lack of information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest." In a later decision in the case, Judge Torres noted that he lacked jurisdiction to consider defendants' claims about the constitutionality of the family separation, but stated, "Defendants, accused of the petty offense of illegal entry, have made novel legal arguments that appear to stem from their understandable concern for their children, and from being completely incommunicado with them while being prosecuted for a very minor offense." DOJ OIG Report, at 17.

80.     In November 2017, the Border Patrol ordered its El Paso Sector to discontinue the Pilot Program and reinstate the prior family unit policy. DOJ OIG Report, at 17.

81.     In January 2018, the U.S. Attorney for the Western District of Texas, John Bash, asked his Deputy Criminal Chief to review the family unit prosecutions they had conducted under the Pilot Program and prepare guidelines for other offices in considering whether to accept a referral in such circumstances. The memorandum drafted in response to this directive recommended certain considerations stemming from the "concern [] that we did not want to separate a child from a parent and not be able to reunite them in their home country." The specific guidelines for prosecutorial decisions included the maturity of the child and the language spoken by the family in order "to

determine if the child could effectively communicate where they were from, where they lived, their address, where they were going to, who they were going to meet." DOJ OIG Report, at 19.

82.     On April 6, 2018, Attorney General Sessions issued a "Memorandum for Prosecutors Along the Southwest Border," with the subject "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)" (the "Zero Tolerance Policy"). DOJ OIG Report, at 23; Dep't of Justice, *Memorandum for Federal Prosecutors Along the Southwest Border* (April 6, 2018) (the "Zero Tolerance Memo"). In the Zero Tolerance Memo, Attorney General Sessions directed all U.S. Attorneys' Offices along the Southwest Border—those "on the front lines of this battle"—to "adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *Id.*

83.     The Zero Tolerance Policy represented a significant change from that of prior administrations. "[P]ast administrations have chosen to simply deport most offenders from the United States rather than use the resources of the criminal justice system to prosecute them. Criminal action has rarely been used in cases of families or parents and children coming across the border." Bipartisan Policy Center, *Why Are Families Being Separated at the Border?*

*84.*     Attorney General Sessions was aware at the time of issuing the Zero Tolerance Memo that the Zero Tolerance Policy would require the prosecution of family unit adults and result in the separation of families. DOJ OIG Report, at 24. Indeed, the separation of families was his intended objective, the prosecution of family unit adults was the tool, and Session's ultimate goal was to "create a more effective deterrent." *Id.*

85.     At that time, DHS Secretary Kirstjen Nielsen understood that DHS "was not logistically prepared to implement the policy without causing chaos in courts and detention centers, and losing track of parents and children." She asked Government officials for a six-month delay of

Zero Tolerance in order to "travel to Central America herself and announce that the policy was imminent," but Government officials denied this request. *Secret History*, p. 59-60.

86. On May 5, 2018, despite her concerns, Secretary Nielsen adopted the Zero Tolerance Policy for DHS and directed her agency to refer for prosecution all adults, including those accompanied by children, who crossed the southwest border of the United States without authorization. DHS OIG Report, at 7.

87. On May 6, 2018, U.S. Attorney Bash informed his staff that DHS leadership had directed Border Patrol agents "to refer all apprehended adult aliens for prosecution," and this "directive includes Family Member Units (FMUs), which is a significant change from previous referrals where one FMU was allowed to remain with the minor child." DOJ OIG Report, at 37.

88. On May 7, 2018, Attorney General Sessions confirmed publicly that the Zero Tolerance Policy would result in the separation of families, stating in a speech, "If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law." DOJ OIG Report, at 37. He did not identify which law supposedly "required" such separation.

89. On May 11, 2018, the U.S. Attorneys for the various districts on the southwest border, including the Western District of Texas, communicated their concerns about the Zero Tolerance Policy, through a DOJ liaison, to the Office of the Attorney General. They expressed that they were "deeply concerned" about "What is happening with these children when they are being separated from the parent? . . . What are the safeguards to the children[?]. . . How are they [DHS] getting the child back to the parent?" DOJ OIG Report, at 39.

90. Later on May 11, 2018, the same group of southwest border U.S. Attorneys met with Attorney General Sessions and directly communicated their concerns about the Zero Tolerance

Policy. In response to their concerns, Attorney General Sessions told the U.S. Attorneys, "we need to take away children." DOJ OIG Report, at 39.

91.     The Zero Tolerance Policy was based on the Pilot Program, but DOJ leadership failed to communicate with the U.S. Attorney for the Western District of Texas to understand the issues his office had already identified in connection with the Pilot Program. DOJ OIG Report, at 32-33.

92.     The Zero Tolerance policy and its attendant family separation practices represented a significant change from past practice. Prior to the Zero Tolerance Policy, it was DHS's practice to issue expedited removal orders to families, who would then go through credible fear interviews and, depending on the results of the interview, either be released into the United States while they awaited an immigration hearing or be deported as a family. DOJ OIG Report, at 51.

93.     U.S. Attorney Bash understood that the Zero Tolerance Policy required him to prosecute all illegal entry cases, even if it resulted in the separation of children from parents. However, he understood that he could take into consideration particular "onerous" challenges that could result from separating children in certain circumstances, such as those who only speak "pre-Columbian languages." DOJ OIG Report, at 41. On May 22, 2018, U.S. Attorney Bash communicated to his staff that they should not be "categorically declining immigration prosecutions of adults in family units," although they could consider "case-specific special circumstances" such as a child who "speaks only a native language." *Id.*

94.     Such a circumstance is plainly applicable to Mr. Ramos Perez, whose son F.R.I. spoke only an indigenous language, but the U.S. Attorney's Office did not consider exercising its discretion in his case as directed by U.S. Attorney Bash.

95.     Neither DHS nor DOJ notified HHS in advance of the implementation of the Zero

Tolerance Policy. In fact, many senior HHS officials first learned of the implementation of Zero

Tolerance through media reports. Office of the Inspector General, U.S. Dep't of Health and Human

Svcs., *Communication and Management Challenges Impeded HHS's Response to the Zero-*

*Tolerance Policy*, OEI-BL-18-00510 (March 2020), www.oig.hhs.gov/oei/reports/oei-BL-18-

00510.pdf, at 14 (hereinafter, "HHS OIG Report").

96.     Beginning in mid-2017, staff in HHS-ORR observed that unusually large numbers

of separated children were entering HHS-ORR care. In early 2018, HHS-ORR staff received

information suggesting that DHS might implement a policy resulting in larger-scale family

separation. HHS-ORR staff communicated this information to higher-level officials in HHS,

conveying their concerns that HHS-ORR's unaccompanied minors program lacked capacity to

accommodate such an increase and that such a policy would inflict trauma on children. HHS

leadership disregarded these specific, repeated warnings. HHS OIG Report, at 14.

97.     HHS-ORR care providers, more typically charged with caring for unaccompanied

minors, who tended to be older and had deliberately traveled alone to the country, lacked sufficient

resources to care for the needs of separated children who had travelled to the United States with a

parent and then had been separated by Government action. HHS officials reported that "separated

children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children

who were not separated;" "[s]eparated children experienced heightened feelings of anxiety and loss

as a result of their unexpected separation from their parents after their arrival in the United States;"

and even observed that "some separated children expressed acute grief that caused them to cry

inconsolably." HHS OIG Report, at 21-22.

98.     Furthermore, HHS has admitted that "the lack of effective interagency information-sharing about separated families significantly impeded [HHS's] ability to identify separated children eligible to be reunified" and in response to a court order, "HHS was unable to produce an accurate list of separated children who had entered ORR's care." HHS OIG Report, at 22.

99.     Similarly, DHS has admitted that it "did not have the information technology (IT) system functionality needed to track separated migrant families during the execution of the Zero Tolerance Policy," even though officials had "been aware of these IT deficiencies since at least November 2017." However, DHS "did not address its known IT deficiencies adequately before implementing Zero Tolerance in May 2018." DHS OIG, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families*, OIG-20-06 (November 2019).

100.     Deputy Attorney General Rod Rosenstein admitted, "The government was not prepared" to handle the family separations caused by the Zero Tolerance Policy, and indeed, the Zero Tolerance Policy "should not have been implemented." DOJ OIG Report, at 35.

101.     Further, federal courts criticized and expressed concerns about the family separation practices accompanying the Government's implementation of the Zero Tolerance Policy. On May 29, 2018, Southern District of Texas Magistrate Judge Ronald Morgan expressed concerns about the Government separating several defendants in a criminal immigration case from their children, explaining that he did not take issue with the Zero Tolerance Policy *per se*, but, "[m]y concern is that the children not suffer unnecessarily. And given the age of the children [ranging from 7 to 17], it's almost an innate suffering that's going to happen when they're separated from their parents." DOJ OIG Report, at 45.

102.     In or around June 2018, a Magistrate Judge in the Western District of Texas communicated to the U.S. Attorney's Office that there should be a standing order requiring the U.S.

Attorney's Office to provide discovery and information on the location of any children separated from defendants in criminal immigration cases. DOJ OIG Report, at 47.

103.     In or around June 2018, the U.S. Attorney for the Western District of Texas prepared a list of questions for DOJ to send to DHS and HHS concerning the family separation process. These questions included many issues reflecting a concern with the kinds of traumatic and tortious conduct experienced by Plaintiffs here: "How are children and parents separated? Is it true that they are often pulled apart physically? What training do [Border Patrol] officers receive on dealing with children humanely?", "How does DHS deal with children who speak only indigenous languages?" and "Why doesn't HHS return the child to the parent as soon as the parent is out of the criminal-justice system, on the view that at that point the child is no longer an 'unaccompanied minor'?" DOJ OIG Report, at 48 (alteration in original). DHS and HHS did not respond to the questions posed by DOJ. *Id.*

104.     DOJ leadership ignored the concerns of U.S. Attorney Bash and his colleagues, and they were not given discretion to decline to prosecute parents where such prosecution would result in family separation. Instead, on June 14, 2018, Attorney General Sessions publicly announced this lack of discretion: "I have ordered our prosecutors to pursue 100 percent of the illegal entries on the Southwest border that DHS refers to us. . . . Having children does not give you immunity from arrest and prosecution." DOJ OIG Report, at 56.

105.     On June 20, 2018, the President issued Executive Order 13841 purporting to end the practice of family separations. However, EO 13841 stated that it was the policy of the federal government to maintain family unity "where appropriate and consistent with law and available resources," § 1, and "to the extent permitted by law and subject to the availability of appropriations." § 3.

106.     In issuing EO 13841, the President was "cav[ing] to enormous political pressure," including "a barrage of criticism from Democrats, activists, members of his own party and even his wife and eldest daughter, who privately told him the policy was wrong." Michael D. Shear, Abby Goodnough and Maggie Haberman, *Trump Retreats on Separating Families, but Thousands May Remain Apart*, N.Y. Times (June 20, 2018). As he signed EO 13841, the President himself admitted, "I didn't like the sight or the feeling of families being separated." *Id.*

107.     On June 26, 2018, the United States District Court for the Southern District of California in *Ms. L. v. U.S Immigration and Customs Enforcement ("ICE")* issued a preliminary injunction ordering DHS to cease separating migrant adults from their children, absent a determination that the parent is unfit or presents a danger to the children, when they are held in DHS custody. 310 F. Supp. 3d 1133 (S.D. Cal. 2018), modified by *Ms. L. v. U.S Immigration and Customs Enforcement ("ICE")*, 330 F.R.D. 284 (2019). The *Ms. L.* court also ordered the Government to reunify children younger than age 5 with their parents within 14 days and children 5 years and older within 30 days of the court order.

108.     Plaintiff families, who were separated at the time of the *Ms. L.* injunction, were not reunited within thirty days of the court order.

109.     The Inspector General of the Department of Justice concluded that the Government's "single-minded focus on increasing prosecutions came at the expense of careful and appropriate consideration of the impact that prosecution of family unit adults and family separations would have on children traveling with them and the government's ability to later reunite children with their parents." DOJ OIG report, at 69.

110.     The Department of Justice did not engage in any discussions with U.S. Attorneys, DHS, or the U.S. Marshals Service prior to implementation of the Zero Tolerance Policy to develop

a process for expediting prosecutions of family unit adults so that child separations would not occur. DOJ OIG Report, at 51.

111.    Separating children from parents was not an inadvertent, collateral consequence of increased prosecutions for unlawful entry and similar immigration offenses; separating children was the intended result of the policy. In instituting and implementing the Zero Tolerance Policy, the Government's goal was to separate children and parents arriving from Central America, to inflict severe emotional distress on them and their family members by doing so, and thereby to punish migrants and attempt to deter future migration to the United States.

112.    The Zero Tolerance Policy never came close to achieving a 100% prosecution rate. In April 2018, CBP apprehended 24,299 adults without children and 4,536 adults with children, and referred 8,298 adults for prosecution, for a prosecution rate of 28.8%. TRAC Immigration, *"Zero Tolerance" at the Border: Rhetoric vs. Reality*, Table 1, https://trac.syr.edu/immigration/reports/520/ ("Virtually every CBP referral results in prosecution." *Id.*, n.4). In May 2018, CBP apprehended 24,465 adults without children and 4,458 adults with children, and referred 9,216 adults for prosecution, for a prosecution rate of 31.9%. *Id.*, Table 1. Because it apprehended a total of 48,764 adults without children in these two months, CBP could have made all 17,514 referrals out of this population and maintained exactly the same prosecution rate without referring a single one of the 8,994 adults with children it apprehended. "The Administration has not explained its rationale for prosecuting parents with children when that left so many other adults without children who were not being referred for prosecution." *Id.*

113.    The overwhelming majority of parents who were referred for prosecution and charged with misdemeanor illegal entry under 8 U.S.C § 1325 pled guilty in advance and were sentenced to time served (i.e., the time in immigration detention between the defendant's arrest and

sentencing). DOJ OIG Report, p. 4-5. Nevertheless, the Government kept parents and children separated for months.

114.     In addition, more than fifteen percent of separated parents were not referred for prosecution at all. *Id.* at 50. Mr. Aguilar Morales was one of those parents.

115.     As explained by former-DHS Secretary and then-White House Chief of Staff John Kelly, in discussing the purpose of the Government's family separation policy, "a big name of the game is deterrence." Asked about the potential harms to families of the separation policy, he said, "It could be a tough deterrent — would be a tough deterrent," and disagreed that separating families was "cruel and heartless" because the children would be "put into foster care or whatever." Nat'l Pub. Radio, *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

### B.   The Government Violated its Legal Obligations Regarding the Detention of Children and other Detained Immigrants

116.     The Government is constrained by multiple legal requirements that create mandatory, non-discretionary obligations that Government agents are required to follow regarding how the Government cares for children and migrants once they are in its custody.

### a.   The Government's Conduct Violated its Obligations under the Flores Consent Decree

117.     First, a settlement agreement in *Flores v. Reno* arose out of class action litigation brought on behalf of minor children held in immigration detention, and the 1997 consent decree remains binding on the United States (the "*Flores* Decree"). *See Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017) (recognizing that the *Flores* decree continues to govern those agencies that now carry out the functions of the former INS, including DHS and HHS-ORR).

118.     HHS-ORR, DHS, and their agents have a well-established legal obligation to ensure the prompt release of minors held in immigration custody and to favor preserving family unity whenever possible. *See Flores v. Reno*, No. CV 85-cv-4544, Dkt. No. 177 (C.D. Cal. July 24, 2015); 8 C.F.R. § 1236.3. The *Flores* Decree also significantly limits the circumstances, duration, and manner of immigration detention of minor children, and requires HHS-ORR, DHS, and their agents to prioritize the prompt release of detained minors.

119.     The *Flores* Decree applies to minors, like J.J.A.R. and F.R.I., who arrived in the United States with their parents. *See Flores v. Lynch*, 828 F.3d 898, 907-08 (9th Cir. 2016) (holding that the *Flores* decree "unambiguously applies to accompanied minors"); *see also Bunikyte ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.").

120.     The *Flores* Decree also limits the time that accompanied minors may be held in immigration detention to twenty days and requires that minors be released to a relative, legal guardian, or licensed program within five days of detention. *Flores v. Lynch*, 212 F. Supp. 3d 907, 913–14 (C.D. Cal. 2015*), aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016) (citing the *Flores* Decree's criteria for the release of minor children in the immigration agency's care); *J.P. v. Sessions*, No. LA CV-18-06081-JAK-SK, 2019 WL 6723686, at *6 (C.D. Cal. Nov. 5, 2019).

121.     The *Flores* decree "clearly states that facilities holding the minors after arrest 'will provide ... contact with family members who were arrested with the minor.'" *United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *7 (W.D. Tex. Jan. 5, 2018),

aff'd sub nom. *United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019) (emphasis omitted).

122.    Here, Government officers had no reason to believe that Mr. Aguilar Morales or Mr. Ramos Perez were unfit parents or otherwise inappropriate caregivers for their children. There was no basis for the Government to violate the requirements of *Flores* that Mr. Aguilar Morales and J.J.A.R., and Mr. Ramos Perez and F.R.I., remain together, and no reason not to permit continued contact between each Plaintiff father and child.

123.    The Government's prosecution of Mr. Ramos Perez was a pretext to separate the family and was done, among other improper reasons, to punish Mr. Ramos Perez and deter other Central American migrants from exercising their right to seek asylum in the United States.

124.    As to Mr. Aguilar Morales, who was not criminally prosecuted in relation to his 2018 entry, the Government cannot assert any basis for separating him and J.J.A.R. When DHS determined that Mr. Aguilar Morales was removable based on his prior immigration history, they did not make any findings or otherwise have any reason to believe that he was an unfit parent or inappropriate caregiver.

125.    The *Flores* Decree creates standards for the treatment of minors while in federal custody and recognizes the vulnerability of immigrant children detained without a parent or other legal guardian. The *Flores* Decree includes a requirement that immigration officers hold minor children in facilities that provide (1) access to food and drinking water; (2) medical assistance in the event of emergencies; (3) toilets and sinks; (4) adequate temperature control and ventilation; (5) adequate supervision to protect minors from others; (6) separation from unrelated adults whenever possible; and (7) contact with family members who were arrested with the minor.

126.     The *Flores* Decree requires the Government to provide services in a minor's language such that the minor can adequately understand the developments of their case, communicate fully with medical and counseling staff, engage with other children, and fully participate in all educational, recreational, and social activities.

127.     Government agents violated these *Flores* standards by failing to promptly reunite Plaintiff families; failing to provide Plaintiff children with sufficient, legally-required contact with family members, and through the numerous forms of harsh and inexcusable treatment to which they subjected J.J.A.R. and F.R.I. as described above, including HHS-ORR's failure to provide J.J.A.R. and F.I.R. any contact with their fathers for several days and for two months, respectively and HHS-ORR's failure to protect J.J.A.R. from the male detainee who sexually abused her; and the months-long failure of DHS and/or HHS-ORR to provide F.R.I. with any language interpretation services.

128.     Second, consistent with the *Flores* Decree, 8 C.F.R. § 1236.3 imposes a mandatory, non-discretionary duty on ICE to prioritize the release of detained minors to family members over refugee shelters or foster care.

129.     Here, the Government violated 8 C.F.R. § 1236.3 by failing to reunify J.J.A.R. with Mr. Aguilar Morales since he was not involved in any criminal proceedings and failing to prioritize the reunification F.I.R. with his father immediately following criminal proceedings involving Mr. Ramos Perez.

### b. The Government's Conduct Violated its Obligations under Multiple Rules and Standards Regarding Treatment of Detained Migrants

130.     CBP's National Standards on Transport, Escort, Detention and Search (the "TEDS Standards") create binding legal obligations for the Government with respect to individuals detained in CBP custody.[1]

131.     The TEDS Standards require that the Government "maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." TEDS Standards, § 1.9, p. 4. Specifically, the TEDS Standards provide, "family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures. In circumstances where family units must be separated due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record." TEDS Standards, § 5.6, p. 22.

132.     Because no legal requirement, safety concern, or security concern required separating Plaintiff families, DHS officers violated this standard by separating Plaintiff children and fathers. For Mr. Ramos Perez, there was no requirement to separate him from his child, but even if his prosecution is construed as a "legal requirement" temporarily mandating separation, the Government should have reunified him with F.R.I. immediately after the criminal proceeding concluded. In the case of Mr. Aguilar Morales, he was never charged or prosecuted so Defendant unequivocally violated this TEDS standard.

---

[1] CBP issued the National Standards on Transport, Escort, Detention and Search (TEDS) in October 2015, and CBP officers were required to abide by these standards during the period of Plaintiffs' separation and detention. *See* Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search 2015 available at https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf.

133.     Further, the TEDS Standards require, as to temperature controls, "When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner." TEDS Standards, § 4.7, p. 16. By deliberately subjecting Plaintiffs to freezing cold temperatures for purposes of punishment and deterrence, DHS officers violated this TEDS standard, as well as obligations under the *Flores* Decree.

134.     As to food provided to detained migrants, the TEDS Standards require, the "Food provided must be in edible condition (not frozen, expired or spoiled)." TEDS Standards, § 4.13, p. 18. Further, "Adult detainees, whether in a hold room or not, will be provided with food at regularly scheduled meal times." *Id.* By failing to consistently provide Plaintiffs with adequate and edible food at regularly-scheduled meal times, DHS officers violated this TEDS standard, as well as obligations under the *Flores* Decree.

135.     In addition, the 2016 Performance-Based National Detention Standards[2] addresses "Medical Care" and requires that detainees "shall be able to request health services on a daily basis and shall receive timely follow-up" and "receive continuity of care from time of admission to time of transfer, release or removal." § 4.3, 257-58. By failing to provide Mr. Aguilar Morales with adequate and timely medical attention for his foot pain and injuries, the Government violated this requirement.

---

[2] In 2000, the Immigration and Nationality Act introduced the Performance Based National Detention Standards (PBNDS) for detention facilities, which ICE officers are required to follow in their treatment of detainees. *See* U.S. Imm. & Customs Enf't, Performance-Based Nat'l Detention Standards (rev. ed. 2016) (the applicable version of the PBNDS at the time of the plaintiffs' detention), available at https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

### c. *The Government Violated Plaintiffs' Constitutional Rights under the Fifth Amendment*

136.    Most fundamentally, the Constitution creates binding and non-discretionary legal

obligations for the Government, which the Government violated through its treatment of Plaintiff

families. *See, e.g.*, *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4

(D. Ariz. Mar. 30, 2020) (finding plaintiffs in similar family separation case had "plausibly alleged

that the government's separation of their families violated their constitutional rights").

### i. *The Government Violated Plaintiffs' Rights to Family Integrity, Procedural Due Process, and Substantive Due Process*

137.    The Government's separation of Plaintiff children and fathers violated their

constitutional right to family integrity, which is secured by procedural and substantive due process.

The Supreme Court has consistently recognized that the parent-child relationship is constitutionally

protected, *see, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246 (1978); *Wisconsin v. Yoder*, 406 U.S. 205,

231–33 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally

important for children to remain in the care and custody of their parents. *See Prince v.

Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture

of the child reside first in the parents, whose primary function and freedom include preparation for

obligations the state can neither supply nor hinder."). These constitutional protections extend to

citizens and non-citizens alike, including when confined by the government. *Jacinto-Castanon de

Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018) ("The fact that

Ms. Jacinto-Castanon is lawfully detained in immigration custody does not eliminate her due

process right to family integrity").

138.    The right to family integrity means that "[a] child cannot be removed without a court

order or exigent circumstances." *Romero v. Brown*, 937 F.3d 514, 521 (5th Cir. 2019) (internal

quotation omitted). Exigent circumstances, in turn, means that there is an "imminent danger of physical or sexual abuse" or "an emergency related to the children's safety." *Id.*

139.     Here, no exigent circumstances or court order authorized the Government to remove Plaintiff children from Plaintiff parents, nor to maintain that separation for many months. This is particularly so where Plaintiff fathers were in immigration detention and no showing was made that they were unfit or posed a danger to Plaintiff children. Thus, the Government violated Plaintiffs' procedural and substantive due process rights by separating Plaintiff families and keeping them separated for many months.

### ii.   The Government Violated Plaintiffs' Equal Protection Rights

140.     The Government's separation and mistreatment of Plaintiff families additionally violated Plaintiffs' constitutional right to equal protection because it was motivated by discriminatory animus towards Latino immigrants of Central American origin. DHS agents targeted Central American migrants and asylum seekers in particular for separation and harsh treatment as a means of deterring them from pursuing legitimate immigration claims.

141.     Indeed, other individuals subjected to the same harsh treatment and separation as Plaintiffs were disproportionately from Central America: more than 95 percent of the members in the *Ms. L* certified class are from Central American countries.

142.     The Zero Tolerance Policy amounted to selective prosecution motivated by discriminatory animus against Latino, Central American immigrants. The Zero Tolerance Policy applied only to prosecutors "along the Southwest border" who were viewed as being on the "front lines" of a "battle." *Zero Tolerance Memo.  See also D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *8 (W.D. Tex. Mar. 23, 2023) ("Defendant's Zero Tolerance Policy plausibly amounted to selective prosecution motivated by discriminatory animus against Latino immigrants.").

143.     DOJ's prosecution of Mr. Ramos Perez constituted an unlawful selective prosecution targeted only at Latino and/or Central American migrants based on discriminatory animus.

144.     As with the fundamental right to family integrity, the constitutional right to equal protection under the law, and to freedom from invidious discrimination by the government on the basis of race or national origin, has long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," whether or not lawfully present in the United States. *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed).

### *iii.   Defendant's Conduct Shocks the Conscience and Violates Plaintiffs' Substantive Due Process Rights*

145.     The Government violated Plaintiffs' procedural and substantive due process rights by separating Plaintiff children and fathers with no notice or opportunity to be heard, sending them hundreds of miles apart, refusing to timely inform Plaintiff children and fathers of each other's whereabouts or well-being, depriving them of any regular or meaningful opportunities for communication with one another, failing to have any system for tracking the children or ensuring family reunification, and unnecessarily delaying their reunification.

146.     In issuing the preliminary injunction in *Ms. L.*, the court found that the Government's family separation policy likely violated the Due Process Clause of the Fifth Amendment of the Constitution because "[a] practice of this sort implemented in this way is likely to be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, interferes with rights implicit in the concept of ordered liberty, and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency." *Ms. L.*, 310 F. Supp. 3d at 1149 (internal citations, quotations, and alterations omitted).  The court further noted that during the weeks after the family separation policy was made public, there was "international condemnation of

the practice." *Id.*; *see also See D.A. v. United States*, No. EP-22-CV-00295-FM, 2023 WL 2619167, at *9 (W.D. Tex. Mar. 23, 2023) ("[T]he staggering backlash that the Trump Administration received following implementation of its Zero Tolerance Policy—which caused that administration to retract the policy after little over two months—evinces the conscience-shocking nature of its forced family separations.").

147.   In particular, the *Ms. L.* court found troubling that "the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence. This is a startling reality." *Ms. L.*, 310 F. Supp. 3d at 1149.

148.   Even before the *Ms. L.* decision, the Government was well-aware that the family separation policy was offensive to Americans. On June 20, as the President caved to public pressure to issue an order purporting to rescind the Zero Tolerance Policy, he admitted publicly, "I didn't like the sight or the feeling of families being separated." *Trump Retreats on Separating Families*. On June 21, Attorney General Sessions admitted publicly, "American people don't like the idea that we're separating families," DOJ OIG Report, at 56.

149.   The Government's treatment of Plaintiff families, pursuant to its Zero Tolerance Policy, violated the Government's mandatory, non-discretionary obligations under the *Flores* Decree, multiple rules and standards specifically governing its treatment of migrants, and most fundamentally, the Fifth Amendment of the United States Constitution.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

150.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

151.     Defendant acted intentionally or recklessly in separating Plaintiff children and fathers even though the Government knew that such separations would cause trauma to Plaintiff families.

152.     Defendant further acted intentionally or recklessly by sending Plaintiff children and fathers hundreds of miles apart from each other, refusing to timely inform Plaintiff children and fathers of each other's whereabouts or well-being, depriving Plaintiff children and fathers of any regular or meaningful opportunities for communication with one another, failing to have any system for tracking children and ensuring family reunification, and by engaging in inordinate delays in reuniting Plaintiff children and fathers.

153.     Defendant further acted intentionally or recklessly in keeping Plaintiff children and fathers in inadequate conditions on detention, including where the Government: housed J.J.A.R. in conditions in which another detainee sexually abused her, failed to provide F.R.I. with any language interpretation services, kept Plaintiffs in facilities with freezing cold temperatures, failed to provide Plaintiff fathers with adequate and unspoiled food, and failed to provide Mr. Aguilar Morales with proper medical treatment.

154.     The foregoing actions by Defendant were extreme and outrageous.

155.     Severe emotional distress was the intended consequence and primary risk of Defendant's separation of Plaintiff families and of its implementation of the Zero Tolerance Policy.

156.     As a direct and proximate result of Defendant's foregoing conduct, Plaintiffs suffered, and continue to suffer, severe emotional distress.

157.     The United States is liable to Plaintiffs for intentional infliction of emotional distress under Texas law and as permitted through the Federal Tort Claims Act.

## COUNT II
## NEGLIGENCE

158.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

159.    The Government had a duty of care to Plaintiffs, as individuals in its custody.

160.    The Government breached the duty of care it owed to Plaintiffs by providing inadequate care and custody during detention.

161.    The Government's conduct in breach of its duty of care proximately caused harm to Plaintiff families.

162.    The United States is liable to Plaintiffs for negligence under Texas law and as permitted through the Federal Tort Claims Act.

## COUNT III
## ABUSE OF PROCESS

163.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

164.    Defendant's employees, officials, and/or contractors abused legal processes within their control for the unlawful purpose of traumatizing Plaintiffs, ostensibly in order to deter future migrants from seeking refuge and pursuing legitimate immigration claims in the United States, purposes motivated by discriminatory animus towards Latinos and/or Central Americans.

165.    Defendant's use of process was not warranted or authorized by law.

166.    Plaintiffs were injured by this abuse of process, as described above.

167.    The United States is liable to Plaintiffs for abuse of process under Texas common law and as permitted through the Federal Tort Claims Act.

## COUNT IV
## NEGLIGENT HIRING AND SUPERVISION

168.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

169.     Plaintiffs suffered damages from foreseeable misconduct of employees supervised by Defendant.

170.     The Government's employees in supervisory roles have a duty to properly supervise federal officers and to oversee their treatment of immigrants in their custody.

171.     The Government's blatant disregard for DHS's own internal policies and standards also demonstrates that DHS management staff were negligent in their nondiscretionary duties to supervise individual officers.

172.     Defendant's negligent supervision proximately caused the unlawful conduct described herein, including the violation of non-discretionary, mandatory obligations imposed on the federal agencies that had custody of Plaintiffs.

173.     As a proximate result of this failure to supervise, Plaintiffs suffered the injuries described herein.

174.     The United States is liable to Plaintiffs for negligent hiring and supervision under Texas law and as permitted through the Federal Tort Claims Act.

### PRAYER FOR RELIEF

Plaintiffs respectfully demand as follows:

A.     Compensatory damages;

B.     Attorneys' Fees and Costs; and

C.     Such other and further relief as the Court may deem just and appropriate.

DATED:  June 28, 2023                    Respectfully submitted,

                                         COYLE & BENOIT PLLC
                                         2515 North Stanton St.
                                         El Paso, Texas 79902
                                         Tel (915) 532-5544
                                         Fax (915) 532-5566
                                         chris@coylefirm.com


                                         Christopher Benoit
                                         Bar No. 24068653

                                         Julie R. Ulmet (*pro hace vice* application pending)
                                         THE LAW OFFICES OF JULIE R. ULMET
                                         417 Grand St., #1804
                                         New York, NY 10002
                                         Tel (646) 396-0055
                                         Fax (646) 340-1022
                                         julie@ulmetlaw.com